Ilsley, J.
This is a proceeding by (puo warranto, in which the plaintiffs, alleging themselves to have been duly elected directors of the Carondelet Canal and Navigation Company of New Orleans, contest the legality of the returns of the commissioners, by which the defendants appear to have, been eleeted, and are accordingly acting as directors.
*483 The grounds upon which the plaintiffs impeach the validity of the commissioners’ returns are the following, to wit:
1. That Louis Gagnet was allowed to vote for the defendants on forty shares, which he had transferred to and which stood in the name of R. M. Davis, President. :
2. That R. M. Davis, through his agent, P. H. Monsseaux, was, denied the right to vote on these forty shares.
3. That J. Llambias, executor of E. Marquez, was denied in person, and through his agent, P. Saloy, the right of voting on twenty-five shares.
4. That L. Gagnet was admitted to vote on five shares, as agent of L. Surgi.
5. That P. H. Monsseaitx was denied the right of voting on these five shares as agent of L. Surgi.
6. That L. Gagnet was allowed to vote as agent on twenty-five shares of A. Mclntire, and on forty shares of A. Culbert.
I. The plaintiffs’ first objection appears to us well founded. ,
By section 8 of the act incorporating the company (Sess. Acts 1857, pi 146) it is provided that “at all elections of directors, and at all other meetings of stockholders, each share of stock shall be entitled to one vote. ”
“ The votes in all cases may be cast by the stockholders in person, or by proxy.” And section 15 of the same act provides, that “no transfer of stock shall be binding on the company, until made in its stock-book, * * and no stockholder shall be permitted to vote at any meeting of the stockholders unless he became a stockholder on the books of the company at least thirty days previous to said meeting.”
Prom these plain provisions of the act of incorporation, and from an inspection of the record, it is manifest that the votes of Louis Gagnet on the forty shares of stock registered in the stock-book in the name of R. M. Davis, President, should have been rejected. The right of voting, conferred by the charter, is not to be tested by the mere ownership of stock, but the transfer of it must be patent on the stock-book.
It is the registry which is the sine quit non for the right to vote on stock; and as these forty shares were not at the time of the election, duly registered in the name of Louis Gagnet, or in that of his principal, his vote on it cannot therefore be counted.
II. Was R. M. Davis properly denied the right to vote on these forty shares ? It is not pretended that R. M. Davis, individually, was the registered transferree of these shares, nor that at the time of the election he was the president of the.company. But, it is contended that inasmuch as the stock stood in the name of R. M. Davis, President, and had not been transferred by him, Davis only, whether president or not, had the right to vote on it.
This position, if correct, might give to one who had ceased to have any interest whatever in the affairs of the corporation, a controlling vote in its management. We would be loath to assent to the correctness of such a proposition, unless imperatively demanded by the express provisions of the law.
In support of their objection, the plaintiffs rely upon the case of the *484 Mohawk' and Hudson 11. 11. Go., 6 Cowen. 135, the facts of which are as follows:
Certain shares of stock stood inscribed on the transfer-books of the company in the name of Samuel Jaudon, cashier.
Samuel Glover, under a proxy from Y. Cowperthwaite, cashier of Philadelphia, appointing him his substitute to vote, etc., and executed thus: “J. Cowperthwaite (L. S.) acccompanied by an affidavit by the said Glover, that' Cowperthwaite was the successor of Samuel Jaudon, as cashier of the United States Bank, attempted to vote on the shares standing in the name of Jaudon, cishier, but his vote was rejected.
The Court, independently of the glaring deficiencies of the instrument alleged to be a proxy of the United States Bank, held, that the adjunct cashier showed no trust in Jaudon, for any certain person—the bank of the United States not being named; that the trust was a matter between Jaudon and the bank, with which the corporation had nothing to do; that the addition of the word cashier was a mere description of the person, and that in view of the provisions of a special statute of the State of New York, the attempt to vote in the name of Cowperthwaite could not be sustained'.
There is evidently a marked difference between the facts of that case and those of the one now under consideration. Jaudon was an officer of a corporation domiciled out of the State of New York, and the inspectors of election could not be expected to take notice ex officio of the fact that he had been cashier of the United States Bank of Philadelphia, and that the addition cashier to his name indicated that he held the1 stock as cashier of that particular bank. But we do not doubt that had Jaudon undertaken to vote on the strength of his nominal title, in opposition to the wishes or without the assent of the proper representatives of the United States Bank, that a Coifrt of equity would readily have interfered, either to enjoin him from so doing or to defeat any legal object he might have sought to attain.
Here, the transfer by Gagnet of this stock on the stock-book, was properly made to its president. The designation of Davis as such on the books could not be treated as a mere descriplio persones.
Neither the shareholders nor the commissioners were at liberty to disregard the official designation of the head officer of the company. Whatever, for instance, might have been said about a transfer to R. M. Davis, treasurer or cashier, he not being at the time treasurer or cashier of the company, could not apply to the present case.
The official designation of its chief officer could not be ignored by the other officers, or by the members of the company.
If 'R. M. Davis had undertaken, without the assent of the directors, to transfer the stock standing in his name as president, could the secretary of the company have honestly complied with a request to enter such a transfer on the books after Davis had ceased to be the president of the corporation ? If not, what right has Davis to act so far as relates to voting, or to any other privilege attached to a title to stock, standing in the name of the president of the company, as if it were entirely under his control, when in truth and in fact, he had no title or claim whatever to it.
And here it may be asked, can stock, standing in the name of and for *485 the corporation itself, be voted upon by one of its officers, at his own discretion ? On this point we adopt the opinion expressed in a New York case, in 5 Oowen, p. 434, ex parte Holmes, in which the Court said : “If there could be a vote at all upon such stock one would suppose that it must be by each stockholder of the company, and in proportion to his interest in it. This brings us to the important difficulty in the case, which is whether stock thus held can vote at all; and we think it is not to be considered as stock held by any one for the purpose of being voted upon. No doubt the company may, from necessity, as in this case, take their own stock in pledge or payment, and keep it outstanding in trustees1' to prevent its being merged, and convert it to their security. But it is not1 stock to be voted upon, within the meaning of the charter or the general act upon which we are proceeding.
It is not to be tolerated, that a company should procure stock in any shape, which its officers may wield to the purposes of an election, thus securing themselves against the possibility of removal.
Monsseaux, therefore, as the proxy of Davis, had no right to vote on these forty shares.
The conclusion we have reached on the sixth objection, urged by the relators, dispenses us from passing upon the third, fourth and fifth objections, as in our opinion, these would not affect the decree we have to render.
YI. This sixth objection is, that Gagnet was allowed to vote as agent on twenty-two shares of A, Mclntire, and on forty shares of A. Culbert.
It is urged that the signatures, both of the parties granting the proxies and of the attesting witnesses should have been proved, and that the testimony adduced by Gagnet is insufficient in law to establish the genuineness of the proxies which he produced on the trial.
It appears that ever since the year 1859, Gagnet has been voting on these proxies in behalf of McIntyre and Culbert.
Independently of the fact that he established the genuineness of the signature of McIntyre to the proxy purporting to be signed by the latter, as well as to the attestation of that purporting1 to emanate from Culbert, he shows that he has been in correspondence with those parties, and that they have apparently acquiesced in his acts for a number of years.
The proxies having been executed, one in Pennsylvania, the other in New York, the difficulty of securing the evidence called for by the plaintiffs in a proeeding conducted in so summary a manner as that resorted to in this case, would perhaps entitle the defendant to an abatement of the rigor of the rules applicable to ordinary cases.
But the presumption, arising from the length of time during which Gagnet has been acting as the agent of the two parties named, is such that, in the absence of any evidence whatever to disprove his agencies, the proof adduced by him must be deemed sufficient.
It is, however, confidently maintained by the plaintiffs, that Gagnet’s agency, having been created prior to the late civil war, the occurrence of that war had the effect of dissolving his agency, inasmuch as his principals resided in the North. It is argued that war between two nations operating a dissolution—not a mere suspension—of all commercial partnerships between the residents of the one and those of the other belligerent *486 country, agencies or mandates must, under the same circumstances, be dissolved for like reason.
Conceding the application of the doctrine, with reference to commercial partnerships, to the belligerent parties in the late civil war, is it true that that'war did- have the effect of putting an end to the agency conferred upon an individual residing here by a party residing in one of the Northern'Statés ? We do not perceive any such analogy between commercial partnerships and agencies of the kind now under consideration, as to induce us to hold that war would, for the same reasons, put an end to both. The continuance of commercial partnership between residents of the belligerent countries would require or encourage active communication or locomotive intercourse between individuals of the belligerent States—intercourse inconsistent with actual hostility, and might foster the resources or increase the comforts of the army. But could, for instance, an agent intrusted with the management of the real estate here of his principal, residingina country atwar with this, be authorized to consider his agency at an end, and abandon the management of the property intrusted to him, on the pretence that the war had freed him from his obligation as agent? Such a doctrine can be sanctioned neither on principle nor authority.
In' the case of Conn v. Penn, 1 Pet. C. C. Rep. p. 523, where an abatement of interest on certain debts during the wars of the revolution, and of 1812, was claimed on the ground that the creditors were subjects and residents of Great Britain, and that payment could not legally have been made to them, Judge Washington said: “This Court, finding itself unshackled with authorities is left to form its own opinion of this question upon general principles, and we feel no hesitation in deciding, that the mere circumstance of war existing between two nations, is not a sufficient reason for abating interest upon the debt due by the subjects of the one belligerent to those of the other. * * *
■ A prohibition of all intercourse, with an enemy during the war, and the legal consequences resulting therefrom, as it respects debtors on either side, furnish a sound, if not in all instances, a just reason for the abatement of interest until the return of peace. As a general rule, it may be safely laid down that wherever the law prohibits the payment of the principal, interest, during the existence of the prohibition, is not demand-able. * * * But the rule can never apply in cases where the creditor, although a subject of the enemy, remains in the country of the debtor, or has a known agent there authorized to receive the debt, because the payment to such creditor or his agent could, in no respect, be construed into the violation of the duties imposed by a state of war upon the debtor. The payment in such cases is not made to an enemy, and it is no objection that the agent may possibly remit the money to his principal; if he should do so, the offence is imputable to him, and not to the person paying him the money.
The same Judge again recognized the right of the agent to act for his , principal, though an alien enemy, in the case of Denniston v. Imbise, 3 Wash. C. C. Rep. page 396. And in the very case of Griswold v. Waddington, relied on by the plaintiff in support of a contrary doctrine, Chancellor-Kent, at page 486, 16 Johns! Reports, quotes with approbation the *487 two cases just referred to, and admits that if a creditor, though a subject of the enemy, have a Icnown agent here, the payment may be made to him, although the agent cannot lawfully remit the money to his principal.
It is clear then, from these authorities, that the agency of Gagnet was not, as supposed by counsel for the plaintiffs, dissolved, or even suspended by the occurrence of the late war.
We conclude then, that there was no error in allowing Gagnet to vote on the twenty shares of Mclntire, and on the forty shares of Culbert.
The twenty-five votes of Llambias and five of Surgi, if conceded to the plaintiffs, would not affect our decision.
Eor, of the nine defendants, all received 1013 votes or more, except J. L. Gubernalor, who only received 963.
Deduct from 1013 the forty shares on votes standing in the name of R. M. Davis, President, and illegally voted upon by Gagnet, and the five voted on by him for Surgi, there still remains for the defendants (Gubernator alone excepted) a total of 968 votes.
Seven of the defendants received 916 votes; one 913, and another, B. Saloy, 934.
Add to 916 the 25 votes claimed for Llambias and five for Surgi, we have a total of 946, which is insufficient to change the result as to eight of the plaintiffs. But the vote in favor of Gubernator, being reduced by our rulings to 923, and B. Saloy, having received the highest number of votes cast for any of the candidates except eight of the plaintiffs, should have been returned as duly elected.
It is therefore ordered, adjudged and decreed, that the judgment of the lower Court, in so far as relates to J. L. Gubernator, be reversed; he not having been elected one of the directors of the Carondelet Canal and Navigation Company of New Orleans at the election held in January last; that B. Saloy be recognized as having been duly elected at that date as director of said company, and entitled as such to the rights and privileges of the office; that the costs of these proceedings in this Court, and in the lower Court, be paid by J. L. Gubernator, in the proportion of one-ninth of the whole; that in other respects, the judgment of the lower Court be affirmed, the costs of appeal, exclusive of those decreed against Gubernator to be paid by the appellants, excepting B. Saloy, the costs of whose application are to be paid as aforesaid, by Gubernator.